Okay, the next case this morning is United States v. Crow, 24-1377. Counsel for appellant, if you would make your appearance and proceed. May it please the court. My name is Howard Pincus from the Federal Public Defender, and I represent Mitchell Crow. At trial, the prosecution's expert offered a previously undisclosed opinion that was a global criticism of the defense expert's pre-trial evaluation of Mr. Crow and his related conclusion that Mr. Crow suffered from sexsomnia, the key contested issue at trial. The district court denied defense counsel any time to meet with his expert so he could effectively counter this new opinion. What is any time, Mr. Pincus? The district court gave him 20 minutes to confer a total to address this issue. Why? So it wasn't any time. I think you're referring to the time after Dr. Borman's direct testimony, Ron. Is that correct? Yes. Yes. At that point, the court instructed Dr. Borman to meet with defense counsel. And the reason was because although by that point, defense counsel knew what opinions Dr. Borman would testify to, he already testified on direct. He didn't know the reasons and bases for those opinions, which the rule also requires to be disclosed. And that's essential for him to then meet with his expert to be able to counter that testimony on cross-examination. Understood. But let me hit the pause button for a second. It was my understanding that, yes, the district court ultimately allotted 20 minutes, period. In other words, you have 20 minutes to meet with the government's expert and then do whatever you're going to do with your own expert. In other words, there was an allotment of 20 minutes. How that time was spent was up to the defense counsel, was it not? In some sense, yes. But the court said, I give you this time. I'm instructing him to meet with you. And he needed that time to find out what the basis of the opinions that the new opinions that were offered were. And the government has never faulted Mr. The defense counsel for taking that time to meet with Dr. Borman. And right after he did so, he said to the court, I need more time to prepare. And defense counsel then said I spent 15 minutes. I first went to the bathroom. I spent 15 minutes meeting with Dr. Borman. And then I went to me with Dr. Kashida, our expert. And I only had 30 seconds to do so before I came back into court. I was coming. Well, that talks that that talks again about a total amount of time, which was up to the defendant to use. And he asked for 30 minutes at a minimum, 30 minutes. Well, the district court gave him 20 minutes. Why is that? I mean, where is an abuse of discretion when the defense lawyer himself seemed to appear that he would settle for 30 minutes to have this post testimony of Dr. Borman and to be able to know the opinions and be able to evaluate all of that. 30 minutes was on the table, was it not? 30 minutes was although he said 30 minutes to an hour, because, of course, he couldn't know what exactly Dr. Borman was talking about, he couldn't know the reason and basis for those opinions. This was a major opinion about malingering that was directly countering the entire report and pretrial evaluation that Dr. Kashida conducted of Mr. Crow and in reaching his conclusion of sexsomnia. So this was something that should have been disclosed before trial. It's disclosed at trial. Defense counsel says, look, there's a lot here. I need at least 30 minutes to an hour. And the court recognizes he originally that he'll need to speak with Dr. Kashida. He then gives him time after the direct says, go speak with Dr. Borman. And that's because he had to know what the basis for the opinions were, not just what the opinions were. OK, well, putting a fine point, putting a fine point on it. The district court, the defense lawyer says I need 30 minutes to an hour. District court says, no, I'll give you 20 minutes. If one talks about that exchange, it seems to me where, you know, at minimum 30 minutes. We're talking about a 10 minute gap. Where does an abuse of discretion come in in that? And let me amplify that a little bit. At one point, is it not, in fact, the case that the defense counsel said, well, when the district court said, well, what do you want? Well, I want this typewritten. Well, OK, so why wasn't this a moving target as to what the defense lawyer actually wanted? It wasn't a moving target because he said, I want these typed up so I can know what the opinions are. That was initially before he knew what Dr. Borman was going to testify to. And even the government said in introducing the topic that these are more than he could encapsulate in just a quick summary. And so he gets these notes and he says, these are just notes, Your Honor. These are not opinions. And I cannot be expected to infer opinions from these notes. It was critical for him to know what Dr. Borman would testify to and the basis for them, his opinion, so that he could then meet with Dr. Kashida. I mean, this is a case that had been going on for years. The sexominy was the key issue at trial. The expert testimony was the major part of a weeklong trial. And the government introduces new opinions that were directly responsive to the defense report and should have been introduced before trial. The defense counsel is only asking for the time to meet with Dr. Kashida. I'm sorry, Mr. Biggis, I didn't mean to cut you off. But I want to ask you, I want to drill down on a couple of times that you mentioned that this was the government expert pushing back on information that was key in Dr. Kashida's report. And I'll just tell you sort of what my trepidation is before we get to the issue that the chief is asking you about. And that is whether or not there was ever a violation of Rule 16C1 in the first place, whether there was a duty to disclose. The two items that you've mentioned in your briefing is Dr. Kashida, the government expert pining Elmer Buttle, that Dr. Kashida had not accounted for the possibility of malingering. And that further testing or a forensic psychiatrist would be necessary to determine malingering in the forensic context. Well, in Dr. Kashida's report, he never opines because he couldn't. Judge Moore prohibited it. All he said was that the conduct that Mr. Groh had identified was consistent with sexsomnia. And he never opined because Judge Moore precluded it of him ever saying that he was or was not actually malingering. And so you have this argument, and I follow it, that, well, there's cross-examination about this is a large secondary gain because he's going to face the potential of acquittal. And then on rebuttal, understandably, defense counsel is going to do what defense counsel does. And that is to say, well, but you didn't find any malingering. But all of that, for whatever reason, I'm not faulting it, but none of that was in Dr. Kashida's report. And so all Rule 16C1GI requires is that the government, in identifying the pre-trial disclosure for rebuttal testimony, is rebuttal testimony that the defendant has timely disclosed under B1C. Dr. Kashida's report never has an opinion one way or the other on whether there was actual malingering or the necessity of testing or how one determines malingering. He never opined about malingering. So I have a question about whether there was an antecedent violation of Rule 16C1GI before we get into the issue that Judge Holmes is inquiring about. Well, first of all, what Judge Moore, what district court wanted to avoid was commenting on the credibility of witnesses on the stand. Sure. And he was very clear about that. And that's why he said to defense counsel, you ask him whether when he was when you interviewed him, was he malingering? That question was OK. So that's not a problem. In terms of the report itself, Dr. Kashida is saying this. I've concluded that his actions are consistent with sexomnia. A ready counter to that testimony, to that opinion, is that Dr. Kashida didn't account for the possibility that Mr. Crow was malingering. And in fact, malingering is in Dr. Borman's report. It's just in a process stage of the report. But that's my point, Mr. Pink. I don't mean to argue with you or with that, but I do want to elucidate my question. So what I'm thinking, and correct me because disabuse me of this, is Dr. Borman disclosed more than he needed to because he really didn't, under 16C1GI, he didn't need to disclose even that, but he did. His opinion on malingering that's introduced at trial is a counter to the opinion of Dr. Kashida that the actions of Mr. Crow were consistent with sexomnia. It was an overall global criticism of how Dr. Kashida conducted his pretrial evaluation and reached his conclusion. That is a counter to testimony, to the expected testimony of the defense expert. That's why it needed to be disclosed. He can't just hide the malingering aspect and introduce it at trial. And we know that's what happened because the prosecution on cross-examination of Dr. Kashida raised secondary gain, which everybody recognized and is recognized in Dr. Borman's report is a hallmark of malingering. So they're saying, you know, you didn't account for this, and then defense counsel makes explicit that we're talking about malingering, and then the government says, well, that's why we get to introduce that. That's wrong. Let me hit the pause button for a second. Aren't there two, and Judge Moritz, did you have something? Yeah, I had some, but I kind of forgot what it was now. Okay. On Rule 16, I mean, aren't there two different discreet disclosure obligations? The one that I inferred that you were making that based upon the report, there was an obligation to do some sort of disclosure. And two, there's the question of what was a supplemental disclosure obligation of the government at the time Dr. Kashida testified. Am I following that correctly? Yes, we are saying that this was an obligation that arose pretrial because it should have been in Dr. Borman's initial report because it was a counter to the expected testimony of Dr. Kashida on its face. So you're not focusing at, go ahead, Judge Moritz. Well, I just want to verify what you're saying is that he should have disclosed it sooner because Kashida's report, at least in the process stages, discussed malingering sufficiently that any opinion that the government's expert had about malingering should have been in its report or supplemented. Is that what you're saying? It's actually Borman's report that has in a process section malingering. Okay, I'm sorry. It's the evaluation. So he did address it. He just said, this is what we do for malingering. He had some rote statement about malingering, a paragraph, but he never tied it to Dr. Kashida. And our point in terms of the pretrial disclosure is that it went to the credibility of his evaluation of Mr. Crow at the time, which was essential to his ultimate determination of sexsomnia. And that was something that a malingering, you didn't account for malingering, you need to consult a forensic psychiatrist, that would have disabled the entire report of Dr. Kashida. And that's what happened in trial. Okay. And, but your real argument seems to be focused, and maybe I'm misunderstanding, not so much on that, that this doctor didn't diagnose malingering or Kashida didn't diagnose malingering, but that the state seems to be somehow saying that she wasn't qualified to diagnose malingering, that they needed a forensic expert. Dr. Borman is saying, which is nowhere in his report, you need to consult a forensic psychiatrist. Otherwise, your whole opinion can't be trusted. And that's why it was accounted for. That's the new part of it, isn't it? I mean, isn't that the new part? That's a specific, I mean, that's taking it completely out of the realm of her ability as a physician or as an expert to diagnose malingering, which I presume most all physicians. Are you talking about Dr. Kashida? Yeah. I mean, isn't diagnosing malingering part of any physician's job? Or accounting for malingering. I mean, if he's basing a large part of his opinion on what Mr. Crow is saying, he's malingering is an obvious counter to that. Well, I want to understand what the obligation is under the rule. I mean, and I also want to understand whether you're talking at all. You seem to be focusing entirely on the pretrial disclosure. I thought you were focusing all as well on the supplemental duty of the government. But as it relates to the pretrial disclosure, it was my understanding under the rule that the government only has to disclose opinions that its expert will put forward. I mean, and the idea that it has to anticipate natural retorts to what the defense lawyer is doing. Where in the rule is that? And what authority do you have for this natural? And we're going to keep going, Mr. Pinker. So where's the authority for that? But if the rule really – if you could really say, well, I didn't intend to introduce that to counter, you could hide a whole mess of stuff by not disclosing it. No, you couldn't, because you still have a supplemental disclosure obligation if things do play out in the course of the trial, right? A supplemental disclosure is for when new material or evidence becomes – they become aware of new material or evidence. That's not this case. But even if it is a supplemental disclosure issue, then they still have to disclose not only the opinion, but the reason and basis for the opinion. And that's what Mr. Crow's counsel wanted to explore with Dr. Kashida. So even if you look at this as a valid supplemental, which it's not because everything was based on a pretrial evaluation known to the prosecution expert at that time, there's nothing new here. Okay, so this is helpful to me. You're not – hold on. So you're not saying – you're saying this is – that is not this case. This is not a supplemental disclosure case as you see it then. I don't think it is, but I think that even if you look at it that way… Whoa, whoa. I'm not looking. I'm taking what you do. I'm not trying to make it anything. So if you're not saying that… I'm saying either way there's a Rule 16 violation. Either way… If your focus is on pretrial disclosure, I ask you a specific question. What was your best authority that the government has to anticipate – has to offer natural retorts in the context of its disclosure obligation pretrial? That was certainly not my understanding of what the rule requires. So talk to me about what authority supports that. The rule requires testimony that will counter the opinion that's been disclosed by the defense. And to Judge Fakirak's point, the defense never spoke about malingering, and if the defense never speaks about malingering, why do you have to say anything to counter it? Because the defense expert is relying on what Mr. Crow told him. That means he is accepting that as a basis for his opinion. The notion that Mr. Crow is malingering or that Dr. Kashida needed to do more to account for malingering is a counter to that testimony. Can I push back on that? That's where the obligation arises. I'm sorry, Ms. Fakirak. I don't want to make them judge you pretty good, but can I – I'll just be candid with you. I'll just tell you – I think you argue the point extremely well, as you always do, but I do want to tell you what my reservation is about what you just said. And then, most importantly, give you an opportunity to tell me where I'm wrong, because I might very well be. It seems to me that there's two possibilities that Dr. Kashida could have made, that I am relying, just as you interpreted, on what Mr. Crow said. I think that what you said, Mr. Crow, is plausible, that you went into J.A.'s room, notwithstanding the multiplicity of steps, and that what you described is so consistent with sexomnia. And, as you said, I don't think you're malingering. I don't think that this is a function of secondary gain. I believe it. But let me just kind of read to you a couple of passages from Dr. Kashida's report, because I think it's entirely consistent that he's not doing that, ever. He's saying his actions could have been the result of him experiencing a non-rapid eye movement-related parasomnia, sexomnia. That's on page 268. Page 275, his actions could have been the result of him experiencing a sexomnia. Page 278. Let's see. It is my opinion that his actions could have been the result of him experiencing a non-rapid eye movement-related parasomnia. So it seems to me that Dr. Kashida is very careful in his report to confine what he's opining about, and he's not saying ... That's why I don't really know why a cross-examination about whether or not the defendant was malingering really has anything to do with the actual opinions that were disclosed by Dr. Kashida, because I don't think he's saying anything to say that what Mr. Crow has said is plausible or that he's not malingering, at least in his report. Now, that morphs into the testimony when he's cross-examined about secondary gain, and then on redirect, then he does say that I don't think he's malingering, but none of that even is remotely suggested in my reading of Dr. Kashida's report in the report itself. But that's a long-winded way of saying, you studied this really well. You're quite a good lawyer. Tell me where I'm wrong. Well, first of all, sexsomnia is engaging in sexual acts while asleep and without awareness. So Mr. Crow is not talking about specific incidents because he has no recollection of ever having sex with J.A. The part that Dr. Kashida is relying on is all his reports of his sleep history, his family history, other times when he has had sex unknowingly with bed partners, all of that history, and that is used by Dr. Kashida to reach the ultimate conclusion of sexsomnia. And that's known at the time, and that's what he is reciting for pages. And that's where Dr. Bornman, the government's expert, is saying you didn't sufficiently account for malingering. Well, that is something that countered what Dr. Kashida did, his overall approach and ultimately his conclusion of sexsomnia. And that's why it should have been disclosed before trial. Now, back to Judge Holmes's point, there's nothing new that came out in that regard because this is all tied to the pretrial evaluation of Mr. Crow. So it's not new material or evidence became aware of that requires supplementation. But even if there should, even if this is supplementation, it needed to at least the rule doesn't say what supplementation requires, but the rule itself is designed to give you an effective party, an effective opportunity to cross examine. And that requires at a minimum knowing what the opinion are and knowing what the reason and basis for those opinions are, which the 1993 advisory committee notes that is perhaps the most important part of the rule. So even if this is a supplementation, the district court should have given Mr. Crow time to meet his counsel, time to meet with Dr. Kashida. Once he learned from Dr. Bornman, which he did on a meeting with him, the reasons and basis for those opinions. And that is the flaw here. So regardless of whether this is a supplementation with. Maybe incomplete and not violating the rule, maybe violating the rule in that context, but even without a violation of the rule, when new stuff comes up at trial, the other party should be entitled to what the rule is designed to do, which is give an effective opportunity to cross by knowing the opinions and the basis reasons of basis for them. And that was only something that defense counsel could know after speaking with Dr. Bornman from his direct testimony. He knew the opinions and the notes by that point were less relevant, obviously, because Dr. Bornman had testified. But what he didn't know and what he needed to know to effectively cross examine with the reasons and basis for them. And that's why I'm saying that the court gave him no time effectively to meet with Dr. Kashida after meeting with Dr. Bornman. And that's what was essential here. And that's why it was an abuse of discretion, a clear error of judgment and not allowing that time. All right. So for the reasons stated in the reply brief, we'd ask the court vacate all the convictions and remand for new trial or at a minimum vacate counts one and two and remand for new trial. Thank you. Thank you. We'll hear from the government. Morning, Your Honors, and may it please the court. Rajiv Mohan for the United States. I would like to start with Mr. Pincus's characterization of this case as one of pretrial disclosure, because I think it goes both to preservation and the standard of review. And that's because I don't think there is any argument below that this malingering opinion should have been raised below before trial. Indeed, I don't think there was much, if at all, discussion of this malingering opinion, period. And I would direct the court to volume five, page 707 of the record, where Judge Moore asked counsel point blank. You know, what has Dr. Boardman said that was new that you couldn't have anticipated? And counsel did not express this malingering opinion. And I think that shows both a lack of preservation and a lack of an abuse of discretion because the district court could not have abused its discretion based on information that was never presented to it. Well, can I push back on a challenge predicated on preservation? The prosecutor before lunch, you know, says we have a disclosure issue. The prosecutor seems to be assuming that there was a violation of Rule 16. You know, he proffers the handwritten notes of Dr. Boardman as a solution. Judge Moore never questions whether or not there was an antecedent violation of Rule 16 itself or the pretrial disclosure. All he is focusing on, understandably, is, well, what do we do? You know, here we are. I don't want the jury to continue to wait. And so this is not, and I don't even think in your briefing, you have argued on your appellate briefing, you've argued, denied that there was an antecedent violation of Rule 16 in the pretrial disclosure. You argue that it satisfied Rule 16C as a supplemental disclosure. But would we be, if we were to reject Mr. Pincus' argument based on the lack of an antecedent violation of Rule 16, are we in effect putting ourselves in the role of advocates for the government in affirming based on an antecedent defect in Mr. Pincus' argument that you have not questioned that Judge Moore never questioned? So a few responses, Your Honor. First, I don't think the prosecutor below conceded an error. I think to raise a disclosure issue is not the same thing as conceding a disclosure error. And to that point, I would note that when counsel objected to Dr. Boardman's testimony on direct examination about malingering, Judge Moore overruled that objection. So I think that the fair reading of that is that Judge Moore did not find a Rule 16 violation. As to our position, let me try and clarify it a little bit. We do not think there was a obligation to disclose this malingering opinion before trial and that, therefore, it was a valid supplemental disclosure under Rule 16C. And the reason why is I go back to what was discussed with Mr. Pincus about how the rule talks about testimony to counter testimony that the defendant has timely disclosed. And I'd like to expand on – Sorry. I just want to – something that the judge kept focusing on, to me, Judge Moore's biggest concern didn't seem to be at all about whether there had been a disclosure violation. He just really didn't care what the argument was. His point was you basically brought this on yourself, the parties, by agreeing to allow your experts, you know, to be present when the other expert was testifying. You didn't sequester them. So he said more than once, too bad for you all. This was a decision you made. You could have predicted this would happen. To me, the judge didn't pay any attention to the disclosure issue. He just refused to. And that's problematic to me because I noticed, too, that the prosecutor never seemed to suggest that there had been a proper disclosure. And, in fact, seemed very concerned about getting these notes and getting them to him and getting him a little bit of time to respond or prepare. So I do think Judge Moore appropriately considered that this was foreseeable given the trial process that the parties had agreed to. Why is that a consideration? If the defendant's alleging a disclosure violation, why does it matter whether this was reasonably foreseeable, which seemed to be the judge's main focus? Why not just look at all the facts that we've been talking about here and determine whether there was a disclosure violation, which the judge never did, despite the defense counsel begging him basically to, you know, help? Well, I would push back on that a little bit because I think, you know, in the discussion after the 20-minute recess, and this is at pages 705 to 708 or so of Volume 5 of the record, you know, Judge Moore does talk about the trial process. But he also asked counsel, hey, what was new here? What was such a surprise that you couldn't have anticipated? And counsel does not mention this malingering opinion, and that's even when Judge Moore gives him a final opportunity to make whatever record he wanted. And I think in that context, Judge Moore appropriately thought that no more time was needed. I would like to go back to this question of a Rule 16 violation and expand on it a little bit in terms of what testimony Mr. Crowe timely disclosed with respect to Dr. Kushida. And I think that if you look at what Mr. Crowe elicited from Dr. Kushida on redirect, and this is pages 600 to 602 or so of Volume 5, it went beyond what I think could be reasonably inferred from the pretrial disclosure. Because you have not only an opinion that Dr. Kushida did not think Mr. Crowe was malingering, but also testimony in support of that based on Dr. Kushida's experience assessing patients and how adept he was at sussing out malingering. And I don't think any of that was included in the pretrial disclosure. And even if the court disagrees and thinks that this issue was foreseeable or obvious or something along those lines, I do think that cuts against Mr. Crowe when it comes to any prejudice and whether a further continuance was needed in that regard. And that's because it refutes the notion that he had no reason to prepare with Dr. Kushida about this issue. And there are a couple of other points. No, let me be clear what you're saying. He had no reason to prepare with Dr. Kushida about the issue on the prejudice point. Would you run that by me again? I wasn't clear what you were saying there. So as I understand Mr. Crowe's argument, he seems to be saying that he was prejudiced by this late disclosure because had it been disclosed before trial, he could have prepared with Dr. Kushida. And because it wasn't disclosed before trial, he had no reason to. And I think if this issue is as obvious as Mr. Crowe suggests, it undercuts that argument. Oh, because if it is a natural retort to Dr. Kushida's report, he also should have anticipated the natural retort. Is that what you're saying? Yes. OK, let me let me fast forward. Let's just let's just move beyond the the pretrial disclosure issue and focus for a second on viewing this through the prism of a supplemental rule 16 disclosure. OK, so the the testimony takes place. Government counsel comes forward and and let's assume for whatever reason it does put us in a new terrain and therefore government counsel comes forward with this. Why in the world is Exhibit nine an adequate, satisfactory basis to disclose in a supplemental disclosure context? I mean, it's a bunch of scribblings which, you know, you would take some expert anthropologist to figure out what the heck is going on. And so why is that sufficient for the government to discharge its rule 16C obligation? So my first reaction when I saw this was that it looked like a bunch of scribbles, too. So I certainly understand the court's initial reaction. What I would say are a couple of things. First, I think in the context of the parties who had been litigating these issues for months, I actually think the disclosure would have been readily understandable. And more than that, I actually think that it would have been evident that there was not much that was actually new on it. And I can offer a couple of specific examples. Yes. And specifically talk about let's let's back up, though, to put a context to these examples. Do you agree with the with the defendant, Mr. Pincus, in this context that the obligation under 16C is to to give the opinions and the rationale for the opinions? Not just topics, but the opinions and the rationale for the opinions. Do you agree with that? I think I do agree with that. I don't think it necessarily has to take the same form as a pretrial Rule 16 disclosure. And I think here Defense Exhibit 9A was supplemented by the opportunity to speak to Dr. Boardman. But I also want to push back against the notion that Defense Exhibit 9A was some massive bombshell that required a lengthy amount of time to respond to. Because I think if you look at what is said in it, a lot of it was actually said in Dr. Boardman's initial report. For example, that sexsomnia involves primal and not complex behaviors and that sexsomnia or that sexual intercourse, excuse me, is not the most common expression of sexsomnia. Those are both things that Dr. Boardman had said in his initial report. That begs the question, you know, A9 was only furnished because the prosecutor had said that we have new opinions. And so the defense counsel understandably may look at that and say just what Mr. Mohon had said. And that is, well, some of this, I can't tell what's going to be new. It's just, you know, this is just essentially references to what I already knew Dr. Boardman was going to testify about. The whole problem is that he needed to ascertain what the new opinions were. So what you're saying seems a little bit adverse to your interest. Well, you know, it's not as if the government, you know, I think perhaps the sparseness of Defense Exhibit A9 cuts both ways. You know, it's not as if the government disclosed pages and pages of supplemental disclosures that counsel had to go through. I think he could have read this fairly quickly and he would have realized that, hey, this stuff about a forensic psychologist or psychiatrist with respect to malingering is new. But this stuff about primal complex behaviors, you know, that was really the whole point of Dr. Boardman's. Well, was it? I mean, the whole reason we're here is the malingering issue. And when I look at this, these scribbles, I mean, I see I'm I see the things you're pointing to. But those things aren't talking about malingering. I mean, they are not expressly doing that. They aren't expressly offering opinions about what, you know, that would counter Dr. Kishida's statements about malingering. They don't do any of that. I mean, so let's assume. Well, and we have a little more time to talk about it, but let's assume for the moment there is a rule supplemental rule 16 C violation here. Focus me on whether the district court did enough to remedy that violation. And what's your best argument there? So a few points. First of all, I think that even to this day, Mr. Crowe has not suggested even a general line of questioning that he would have pursued with additional consultation. And that regard, I would note that Dr. Kushida was present during Dr. Boardman's testimony. So if there truly was some additional line of questioning, Dr. Kushida could have made that known to counsel even after the fact. And counsel could have made that known to the court either later in trial or in a new trial motion. But the case law focused on potential prejudice, not not actual prejudice. Right. So I think there's certainly language of potential prejudice. I think if you look at the cases that Mr. Crowe cites for that point, I don't think any of them establish sort of a minimal threshold. And I think the abuse of discretion standard is accommodating enough to account for the nature of prejudice. I'd also note, if you look at those cases, I think they involve much more significant disclosure violations. Most often the disclosure of a brand new witness on the eve of trial or in the middle of trial and much more specific claims of prejudice. I mean, I point to United States versus Adams as an example where you had a late disclosure of a defense mental health expert. And that deprived the government of the opportunity to conduct an independent examination. I don't think we have even sort of a general sense of what additional cross examination would have entailed. And I think that's unsurprising because both experts sort of said their piece on malingering. They disagreed. And that was that. And so I think those. But, you know, just to push back on that a little bit and tell me what I'm looking at this too simplistically. How in the world would defense counsel be able to do that? I mean, you're sure not going to give permission to Mr. Pink is to call Dr. Borman and then, you know, ask the questions that he wasn't able to do in the 30 seconds that he had, you know, to speak with Dr. Kushida. And so, you know, so then he can now talk to Dr. Kushida. And then what is he going to do? Say, well, I could have asked these questions of Dr. Borman. Well, you know. Well, I'm sorry. Go ahead. You need answers. And I see my time is up. If I may answer the question, I think that counsel could have made a record and we might have a different analysis of the abuse of discretion here. And I would also note that there was this other member of the defense team who could have consulted with Dr. Kushida. And I think that's another indication that there was no prejudice here. Could you just briefly address your harmless error argument? It seems to me that the jury's verdict here, you know, quitting on two counts, I believe, and convicting on the other. Indicates that it really was about the battle of experts and what they believed in terms of sexsomnia and what, you know, what each expert said the characteristics or attributes of it were. I mean, it seems that it'd be a little hard to say this was harmless since this was all about the experts testimony. And the jury did clearly bite off on some aspects of the defense experts testimony, perhaps when it came to acquitting on the counts where the defendant didn't did actually have to or didn't actually have to do many acts, I guess, in terms of they were in the same room together to start that type of thing. And I want to be sorry. Yes. And I want to be careful about how I frame the harmlessness question, because Mr. Crow has not challenged the admission of Dr. Borman's malingering opinion on appeal. So I think the question is not whether that opinion was harmless or prejudicial, but rather whether the denial of more time was harmless or prejudicial. And I think there are a number of reasons why that wasn't the case. First, this opinion about malingering and I would go back, I think, by arguments about prejudice bleed into the harmlessness and the failure to articulate applies to both those points. But this opinion about malingering did not directly relate to the fundamental dispute that Your Honor described between the experts, which was really whether more complex acts such as opening and closing doors were inconsistent or consistent with sexsomnia. Malingering doesn't really have anything to do with that, which is why I think Mr. Crow suggests that it might have had this more general effect on how the jury assessed the expert's credibility. And let me offer a few responses to that. First, I think the jury heard a large volume of unchallenged expert testimony. And so I think the volume of that testimony reduces the impact of any additional cross-examination on this point. I would also note that Dr. Kushida defended his assessment of malingering. So it's not as if this opinion went wholly uncontested. And while the government certainly attacked Dr. Kushida for any number of things, it did not bring up Dr. Borman's malingering opinion in either closing or rebuttal. Thank you. On what I thought you were going to say, and you did not, is that somehow or other prejudice was reduced by the fact that we heard from the defendant on the stand in terms of what his view was, and that Dr. Borman was in effect undercutting the line of testimony of the defendant. I thought that was a view of your brief, right? That's right. I mean, I think I guess I would put it like this. I think there were two big disputes between the experts. One is sort of whose story did you credit Mr. Crow or J.A.? Frankly, I think that was not the proper subject of expert testimony to begin with, and that the jury made that determination, resolved that dispute by reference to the testimony of both the victim and Mr. Crow. I think the other dispute is this question about complex versus primitive actions, and that has nothing to do with malingering. Well, wasn't there a dispute about – well, I thought that Dr. Borman's testimony in part went to whether Dr. Kashida was qualified to make a malingering determination. And to the extent that Dr. Borman undercut Dr. Kashida's view that there was no malingering, wouldn't the idea then be planted in the jury's mind that in fact he may have been malingering, and hence the complex acts would have been the ones that would fall if anything fell? Well, I think that if that seed was planted in the jury's mind, it would have resolved any question about malingering by listening to Mr. Crow and listening to the victim. And I think in this regard, it's perhaps worth noting that while the pretrial opinions were framed very much in terms of specific opinions about this case, I think the district court forced both experts into more hypotheticals at trial. So what the jury heard was, were these actions consistent with sexsomnia? Were these types of actions consistent with sexsomnia? And I think that undercuts any prejudicial effect with respect to the specific facts of this case. Anything else from my colleagues? I don't have anything for the ability, but if it's permissible, I have one question for Mr. Pincus. It's always permissible. All right. Thank you, counsel, for the government. Mr. Pincus, you're up again.  Just to respond to the questioner. To respond to the question. I think there was sufficient additional time offered. So please respond to Judge Bacrak's question. So I don't want to belabor this, but I did want to ask you since there has been quite a bit of discussion about Rule 16C. And I'll just tell you the way I read 16C. And you just tell me if I'm wrong, a party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party or the court if, number one, the evidence or material is subject to discovery or inspection under this rule. And so the way I have always understood Rule 16C1, and I'm guilty of a lot of misinterpreting of rules and statutes. But I had thought that this isn't really kind of a standalone, you know, something new comes up during trial, then you have to supplement it. It's this language, if it is subject to discovery or inspection under this rule and Rule 16. To me, the operative language is Rule 16C1GI. And so if there is additional information that comes up that is discoverable under Rule 16C1GI that the prosecutor didn't know about at the time that he furnished Dr. Borman's report came up during the trial, then he would need to disclose it. But I don't understand, if my reading of 16C1 is correct, why the prosecutor would need to disclose these additional bases for the opinion of Dr. Borman if they weren't discoverable pretrial because they weren't responsive to Dr. Kushida's information that was timely disclosed under 16CB1C. Do you follow my question? So my question is, if it wasn't initially discoverable under 16C1GI, how could it be discoverable under 16C1? Well, I mean, 16C1GI portion is talking about testimony that goes to counter what was disclosed by the defense. So this is certainly countering Dr. Kushida's testimony. And it's the government who's been arguing this is something that this was just a supplemental notice. I think the advisory committee notes do talk about how additional opinions of an expert, but I would focus on the part about where additional evidence or material arises a trial that requires a supplementation. I don't think that happened here. Again, even if it should have been a Rule 16C disclosure, it's inadequate because these notes, as Judge Holmes was pointing out, are just scribbles. And the government is the one saying that this wasn't all the defense had. They had the opportunity to meet with Dr. Borman. And that's precisely our point. Defense counsel needed to do that. And only then could defense counsel meet with Dr. Kushida to be able to counter this new opinion. Thank you so much. Okay. Thank you, counsel. Thank you, Chief, for indulging.  Thank you, counsel, for your fine arguments. Case is submitted.